# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| NATIONAL AUDUBON SOCIETY, ) | |
| ) | |
| NATURAL RESOURCES DEFENSE ) | |
| COUNCIL, INC., ) | |
| ) | **COMPLAINT FOR** |
| AMERICAN BIRD CONSERVANCY, ) | **DECLARATORY AND** |
| ) | **INJUNCTIVE RELIEF** |
| CENTER FOR BIOLOGICAL DIVERSITY, ) | |
| ) | |
| DEFENDERS OF WILDLIFE, ) | Civ No. 1:21-cv-448 |
| ) | |
| NATIONAL WILDLIFE FEDERATION, ) | |
| ) | |
| and SIERRA CLUB, ) | |
| ) | |
| Plaintiffs, ) | |
| ) | |
| v. ) | |
| ) | |
| U.S. FISH AND WILDLIFE SERVICE, and ) | |
| ) | |
| U.S. DEPARTMENT OF THE INTERIOR, ) | |
| ) | |
| Defendants. ) | |

## INTRODUCTION

1.      The Migratory Bird Treaty Act (MBTA) broadly applies, by its plain terms, to the killing of any migratory bird "at any time, by any means or in any manner." 16 U.S.C. § 703(a).  In August 2020 this Court held unlawful and vacated the "Jorjani Opinion"—an attempt by Defendants U.S. Department of the Interior (DOI) and Fish and Wildlife Service (FWS) to construe the MBTA as applying only to actions that are specifically directed at taking or killing migratory birds. The Court held that Defendants' interpretation—which eliminated protections for birds

1

that would be "incidentally" killed by industrial activities in the course of their regular operations—violated the unambiguous language and overriding conservation purpose of the MBTA. *See NRDC v. U.S. Dep't of the Interior* ("*NRDC*"), -- F. Supp. 3d --, 2020 U.S. Dist. LEXIS 143920 (S.D.N.Y. Aug. 11, 2020).

2.     Notwithstanding this Court's ruling, Defendants continued to implement the Jorjani Opinion in contravention of the Court's vacatur order. And now, Defendants—stating that they "disagree" with the Court's decision—have adopted a regulation codifying the same unlawful legal interpretation the Court rejected. In flouting the Court's ruling, Defendants also run roughshod over the National Environmental Policy Act (NEPA) in several respects, including by failing to consider reasonable alternatives to a regulation that will allow millions of migratory birds to be killed with impunity. Accordingly, Defendants' regulation should meet the same fate as the unlawful Jorjani Opinion on which it is based: it must be declared illegal and set aside.

## JURISDICTION

3.     This Court has jurisdiction over Plaintiffs' claims under 28 U.S.C. § 1331. Venue is appropriate in this Court under 28 U.S.C. § 1391(e)(1)(C) because this is a civil action brought against agencies of the United States and Plaintiffs National Audubon Society and Natural Resources Defense Council maintain their principal place of business in this judicial district, *id*. § 1391(c)(2).

## PARTIES

4.     Plaintiff National Audubon Society, Inc. (Audubon) is a national

nonprofit conservation organization—exempt from tax under Section 501(c)(3) of the

Internal Revenue Code—dedicated to protecting birds and the places they need,

today and tomorrow, throughout the Americas using science, advocacy, education,

and on-the-ground conservation. Founded in 1905, Audubon has over 1.2 million

members nationwide, including 64,719 members in New York where it is

incorporated. Among its many activities, Audubon operates 41 nature centers, has

23 state programs, and over 450 local chapters throughout the country, including 27

in New York. Audubon, its chapters, and its members played a significant role

advocating for the passage of the MBTA in 1918. Since then, the MBTA has been a

foundation for nearly all of Audubon's activities and goals providing baseline

protections for most of the nation's native bird species, thereby enabling Audubon to

achieve its mission of protecting birds and the places they need.

5.     Plaintiff Natural Resources Defense Council (NRDC) is a national

environmental advocacy group organized as a New York non-for-profit corporation.

NRDC has offices in New York, Chicago, the District of Columbia, San Francisco,

Santa Monica, and Bozeman, and has hundreds of thousands of members across the

country. NRDC's mission is to safeguard the Earth: its people, its plants and

animals, and the natural systems on which all life depends. NRDC has a

longstanding interest in defending bedrock environmental laws and protecting

wildlife from the threats of industrial development and pollution. NRDC has

worked for many years to protect migratory birds and their habitats through litigation, science, and advocacy, including efforts to bolster regulatory protections and to work with industry and the agencies in developing guidelines and best management practices to avoid unnecessary harm to birds.

6.      Plaintiff American Bird Conservancy (ABC) is a 501(c)(3) non-profit conservation organization whose mission is to conserve native birds and their habitats throughout the Americas. ABC pursues this mission by safeguarding the rarest bird species, conserving and restoring habitats, and reducing threats to bird species. ABC's more than 8,000 individual members, as well as its staff, board members, donors, and supporters, enjoy observing, studying, and photographing migratory birds throughout the country, including in New York. ABC is a leading organization working to reduce threats to birds from habitat destruction; from collisions with buildings, towers, and wind turbines; from toxins such as hazardous pesticides and lead, and myriad other threats. ABC pursues its goals through scientific research and analysis; advocating for bird conservation at the local, state, regional, and federal levels; forming bird conservation partnerships with other organizations throughout the northern and southern hemispheres; and advocating for meaningful regulatory changes to address threats to birds effectively through various means, including the submission of rulemaking petitions.

7.      Plaintiff Center for Biological Diversity (Center) is a 501(c)(3) corporation that is headquartered in Tucson, Arizona, with offices in various locations throughout the country. The Center works through science, law, and policy

to secure a future for all species, great or small, including many species of migratory birds. The Center is actively involved in efforts to conserve migratory birds and their habitat. The Center has more than 63,000 members throughout the United States and the world, including more than 4,300 in New York.

8.     Plaintiff Defenders of Wildlife (Defenders) is a non-profit membership organization headquartered in Washington, D.C. with field offices throughout the country. Founded in 1947, Defenders is a science-based conservation organization with over 340,000 members nationwide, including more than 26,000 in New York. Defenders is dedicated to the protection of all native wild animals and plants in their natural communities and the preservation of the habitats on which they depend. Defenders advocates for new approaches to wildlife conservation that will help keep species from becoming endangered, and it employs education, litigation, research, legislation and advocacy to defend wildlife and habitat. Defenders is one of the nation's leading advocates for endangered species and wildlife conservation.

9.     Plaintiff National Wildlife Federation (NWF) is a national not-for-profit membership organization dedicated to the protection of the environment and natural resources. Founded in 1936, NWF has more than a million members, partners, and supporters nationwide, and has affiliate organizations in fifty-one states and territories. NWF's mission is to educate, mobilize, and advocate to preserve and strengthen protection for wildlife and wild places. Among other things, this includes advocating for the protection of migratory birds from harm from oil and gas development, pipeline projects, and other direct industrial threats.

10.     Plaintiff Sierra Club is the nation's oldest and largest grassroots environmental organization, and has 67 chapters across the country. Sierra Club is incorporated in the State of California, with headquarters in Oakland, California, and has over 830,000 members nationwide dedicated to exploring, enjoying, and protecting the wild places of Earth; to practicing and promoting the responsible use of the Earth's ecosystems and resources; to educating and enlisting humanity to protect and restore the quality of the natural and human environment; and to using all lawful means to carry out these objectives. Its mission includes engaging its members and the public to protect wildlife and their habitats, including advocating for protections for migratory birds. For example, Sierra Club has participated in both advocacy and litigation to address the impacts of oil and gas development, such as drilling and pipelines, on migratory birds and other wildlife. Sierra Club has approximately 53,000 members in New York state.

11.     Plaintiffs' members have recreational, aesthetic, educational, and scientific interests in the preservation of migratory birds and rely on the Plaintiff organizations to advocate for those interests. Many of Plaintiffs' members regularly observe, study, photograph, protect, and otherwise enjoy migratory birds in the wild. Plaintiffs and their members are therefore injured by the challenged regulation, which codifies an interpretation of the MBTA that does *not* prohibit the "incidental"—*i.e.*, the unintended albeit foreseeable—killing of migratory birds, and therefore removes industry's legal incentive to avoid killing birds. Companies' failure to take such preventive measures will result in millions of bird deaths that

otherwise would have been avoided, and it will subject certain species to greater risk of becoming threatened or endangered. Plaintiffs' members reside and recreate in areas where these impacts occur, and where affected birds would have migrated or otherwise used for habitat.

12.     The unlawful legal interpretation codified in the regulation already has had, and will continue to have, significant on-the-ground effects that harm the interests of Plaintiffs and their members, including by eliminating any legal incentives for companies to avoid or minimize killing and injuring migratory birds. Industrial sectors that have sought to avoid and/or minimize impacts on migratory birds in the past have already relied, and will continue to rely, on the legal interpretation codified in the regulation to avoid taking measures that otherwise would have prevented unnecessary bird deaths.

13.     Defendants' legal position as codified in the regulation also undermines federal support for and involvement in the continued development of best management practices to reduce the take and killing of migratory birds by various industries. Consequently, the regulation harms, and will continue to harm, the Plaintiff organizations by requiring them to divert their limited resources and personnel in an attempt to fill the gap left by the federal government's abandonment of efforts to implement the MBTA so as to mitigate the impact of industrial activities on migratory birds.

14.     Declaring the regulation unlawful and setting it aside will redress these injuries to Plaintiffs and their members.

7

15.     Defendant FWS is a federal agency within DOI that is authorized and required by law to protect and manage the fish, wildlife, and native plant resources of the United States. FWS implements and enforces the MBTA and has primary authority for its day-to-day administration.

16.     Defendant DOI is an agency of the United States with ultimate responsibility for the administration and implementation of the MBTA.

## BACKGROUND

### The History of the MBTA's Expansive Protection for Migratory Birds

17.     In 1916, the United States entered into an agreement with Great Britain, on behalf of Canada, to establish a "uniform system of protection" for migratory birds. *See* Convention Between the United States and Great Britain for the Protection of Migratory Birds, Aug. 16, 1916, 39 Stat. 1702 (Canada Convention). The Canada Convention addressed a "national interest of very nearly the first magnitude," *Missouri v. Holland*, 252 U.S. 416, 435 (1920), and "recited that many species of birds in their annual migrations traversed certain parts of the United States," but "were in danger of extermination through lack of adequate protection." *Id.* at 431.

18.     Congress enacted the MBTA in 1918 to implement the Canada Convention "for the protection of migratory birds." Act of July 3, 1918, ch. 128, 40 Stat. 755. Since then, the United States has entered into additional treaties for the conservation of migratory birds with Mexico, Japan, and the former Soviet Union. *See* Convention for the Protection of Migratory Birds and Game Mammals, Feb. 7,

1936, 50 Stat. 1311 (Mexico Convention); Convention for the Protection of Migratory Birds and Birds in Danger of Extinction, and Their Environment, Mar. 4, 1972, 25 U.S.T. 3329, T.I.A.S. No. 7990 (Japan Convention); Convention Concerning the Conservation of Migratory Birds and Their Environment, Oct. 13, 1978, 29 U.S.T. 4647, T.I.A.S. No. 9073 (Russia Convention).

19.    In amending the MBTA in 1936 to incorporate the Mexico Convention, Congress adopted the current version of the prohibition on the killing of migratory birds. Pub. L. No. 74-728, § 3, 49 Stat. 1556. Since that time, the MBTA has provided that: "[u]nless and except as permitted by regulations made as hereinafter provided in this subchapter, it shall be unlawful at any time, by any means or in any manner, to pursue, hunt, take, capture, kill, attempt to take, capture or kill" migratory birds. 16 U.S.C. § 703(a).

20.    Both the conventions with Japan and the Soviet Union broadly called for the parties to prevent damage to birds from pollution. *See* Japan Convention, art. VI; Russia Convention, art. IV. In 1995, the United States and Canada negotiated modifications to the original Canada Convention requiring the countries to "seek means to prevent damage to such birds and their environment, including damage from pollution." Protocol Between the Government of the United States and the Government of Canada Amending the 1916 Convention Between the United Kingdom and the United States of America for the Protection of Migratory Birds, Dec. 5, 1995, S. Treaty Doc. No. 104-28, art. IV. The Mexico Convention was similarly modified in 1997. *See* Protocol Between the Government of the United

9

States of America and the Government of the United Mexican States Amending the

Convention for the Protection of Migratory Birds and Game Mammals, May 5, 1997,

S. Treaty Doc. No. 105-26.

### Subsequent Acts of Congress that Reinforce the MBTA's Application to Industrial Activities that Foreseeably Kill Migratory Birds

21.     In 1986, Congress contracted the MBTA's felony reach to only

"knowing" violations. *See* Pub. L. No. 99-645, § 501, 100 Stat. 3590 (amending 16

U.S.C. § 707(b)). Congress left untouched the MBTA's misdemeanor provision,

which provides that "any person, association, partnership, or corporation who shall

violate any provisions of said conventions or of this subchapter, or who shall violate

or fail to comply with any regulation made pursuant to this subchapter shall be

deemed guilty of a misdemeanor . . . ." 16 U.S.C. § 707(a).

22.     In 2002, Congress exempted certain narrowly defined military

readiness activities from the MBTA's general protections. In response to a court

ruling which found that military drills that incidentally killed migratory birds

violated the MBTA, *see Ctr. for Biological Diversity v. Pirie*, 191 F. Supp. 2d 161

(D.D.C. 2002), Congress exempted military readiness activities on a temporary

basis from liability for incidental take under the MBTA. *See* Pub. L. No. 107-314,

div. A, title III, § 315(a), 116 Stat. 2509 (2002). Congress retained liability, however,

for routine installation support activities and the "operation of industrial activities"

by the military. *Id.* § 315(f)(2). Congress simultaneously directed DOI to promulgate

regulations under the MBTA authorizing incidental killing by military readiness

activities provided that the military comply with regulations to monitor and

minimize impacts on migratory birds. *Id.* § 315(d). FWS issued such regulations in 2007. *See* 50 C.F.R. § 21.15.

**Defendants' Consistent Interpretation that the MBTA Prohibits Incidental Killing of Migratory Birds by Industrial Activities**

23.     For more than seventy years, FWS construed, and the U.S. government enforced, the MBTA as a statute that applies regardless of the actor's specific intent to kill or take migratory birds. *See, e.g.*, *United States v. Schultze*, 28 F. Supp. 234, 236 (D. Ky. 1939) (endorsing the government's position that "[i]n view of the broad wording of the act, and the evident purpose behind the treaty and the act . . . it was not the intention of Congress to require any guilty knowledge or intent to complete the commission of the offense, and that accordingly scienter is not necessary"); *United States v. Reese*, 27 F. Supp. 833 (W.D. Tenn. 1939) (similar).

24.     From the early 1970s until 2017, DOI and FWS interpreted the MBTA to prohibit incidental killing of migratory birds, imposing liability for activities and hazards that led to the deaths of protected birds, irrespective of whether the activities were specifically aimed at harming birds. *See NRDC*, 2020 U.S. Dist. LEXIS 143920, at *10. After industrial activities emerged as the most significant threat to bird populations in the latter half of the century, FWS regularly investigated causes of incidental killing; among them oil pits, power-lines, contaminated waste pools, oil spills, and commercial fishing lines and nets. FWS, through the U.S. Department of Justice, brought cases involving industrial activities that foreseeably and predictably kill migratory birds, such as operating oil pits without precautions to protect birds, *United States v. Stuarco Oil Co.*, No. 73-

CR-129 (D. Colo. Aug. 17, 1973); misapplying pesticides in areas known to be frequented by birds, *United States v. Corbin Farm Servs.*, 444 F. Supp. 510 (E.D. Cal. 1978), *aff'd on other grounds*, 578 F.2d 259 (9th Cir. 1978); operating contaminated waste treatment ponds in the absence of any measures to safeguard birds, *United States v. FMC Corp.*, 428 F. Supp. 615 (W.D. N.Y. 1977), *aff'd*, 572 F.2d 902 (2d. Cir. 1978); and erecting power lines in areas with high concentrations of migratory birds, *United States v. Moon Lake Elec. Ass'n*, 45 F. Supp. 2d 1070 (D. Colo. 1999).

25.     The MBTA has also been invoked to charge companies for the incidental killing wrought by oil spills such as the *Exxon Valdez* and *Deepwater Horizon* disasters, which together killed over a million birds. *See* Judgment, *United States v. BP Expl. & Prod., Inc*, No. 2:12-cr-00292-SSV-DEK (E.D. La. Jan. 29, 2013); Plea Agreement, *United States v. Exxon Corp.*, No. A90-015 CR (HRH) (D. Alaska Sept. 30, 1991). The MBTA's application to such catastrophes resulted in over $100 million in penalties paid as part of plea deals. Much of that money went directly into the North American Wetlands Conservation Fund to restore habitat for waterfowl and other wildlife. *See* 16 U.S.C. § 4406(a); *see also, e.g.,* Press Release, U.S. Dep't of Justice, *Exxon-Mobil Pleads Guilty to Killing Migratory Birds in Five States* (Aug. 13, 2009), https://www.justice.gov/opa/pr/exxon-mobil-pleads-guilty-killing-migratory-birds-five-states (plea deal that included $400,000 in MBTA fines would fund waterfowl rehabilitation and preservation work).

26.     In 2001, President Clinton issued an executive order, *Responsibilities of Federal Agencies to Protect Migratory Birds*, that applied expressly to incidental killing and taking and recognized that FWS's wildlife regulations did so as well. Exec. Order 13186, § 2(a)-(c), 66 Fed. Reg. 3853 (Jan. 10, 2001) (construing FWS's regulatory definition of "take," 50 C.F.R. § 10.12, to include "take that results from, but is not the purpose of, the activity in question.").

27.     In 2008, the U.S. State Department exchanged formal diplomatic notes with Canada affirming the countries' common interpretation that their migratory bird treaty obligations apply to incidental killing.

**FWS's Best Management Practices to Address Incidental Killing**

28.     To conserve migratory birds and ensure compliance with the MBTA's prohibition on incidental killing, FWS has used a range of strategies and prioritized a cooperative approach with industry over enforcement actions. *See NRDC*, 2020 U.S. Dist. LEXIS 143920, at *11. FWS used the MBTA's enforcement authority to encourage implementation of best management practices for industries that incidentally kill and injure migratory birds in the course of their routine operations. FWS and the Department of Justice brought enforcement actions only in limited circumstances, such as when an entity had been repeatedly warned of the killing, and refused to take available measures to minimize it, or when large numbers of birds were killed (such as the Exxon Valdez and Deepwater Horizon disasters). These measures helped to reduce impacts on migratory birds, and compliance with their terms factored into FWS's MBTA enforcement decisions. Plaintiff

organizations played a significant role, and expended considerable organizational resources, in developing and improving many of these best practices.

29.     In 2015, FWS published a notice of intent to undertake a programmatic Environmental Impact Statement (EIS) in connection with a rulemaking for the establishment of an incidental take permitting system under the MBTA. 80 Fed. Reg. 30,032 (May 26, 2015). Explaining DOI's "longstanding position" that the "MBTA applies to take that occurs incidental to, and which is not the purpose of an otherwise lawful activity," and that "sources of avian mortality are becoming more prevalent across the landscape" and "contributing to continental-scale population declines for many species," FWS sought public input on the design of a regulatory system to permit incidental take by industry sources. *Id.* at 30,033-34. Specifically, FWS announced that it was contemplating regulations under 16 U.S.C. § 704(a) that would establish a general conditional authorization for incidental take by certain industry sectors, so long as companies in those sectors adhered to best practices for protecting birds—e.g., maintaining protective netting over oil, gas, and wastewater disposal pits, and using recommended siting practices and flashing lights for communication towers. *Id.* at 30,035. FWS explained that an incidental take authorization program would build on voluntary guidelines and practices to protect migratory birds and would provide greater certainty for industry actors that comply with such measures to reduce impacts to birds. *Id.* at 30,033-34.

30.     In furtherance of that rulemaking, then-Solicitor of the Interior Hilary
Tompkins released Opinion M-37041 – *Incidental Take Prohibited Under the
Migratory Bird Treaty Act* (Jan. 10, 2017) (Tompkins Opinion), which
comprehensively analyzed the MBTA's text, legislative history, and purpose; the
underlying treaties; past agency practice; and the relevant case law. The Tompkins
Opinion concluded that the "MBTA's broad prohibition on taking and killing
migratory birds by any means and in any manner includes incidental take and
killing," and that the "government need not show that a defendant willfully or
intentionally took or killed birds to prove a violation of the MBTA." Tompkins
Opinion at 2. The opinion also pointed out that "[i]n many cases, simple, relatively
low-cost methods have proven effective in reducing the impacts of these activities on
migratory birds," including, *e.g.*, "replacing non-flashing warning lights on
communication towers with flashing lights; marking power lines with bird
diverters; implementing greater spacing of insulators on power poles and other
practices to reduce electrocution hazards of power lines; fencing and netting waste
pits; updating mining operations to eliminate the use of tailing ponds, and
employing streamer lines on longline fishing vessels to reduce seabird catch." *Id.* at
1. The opinion explained that such modest measures could significantly reduce
adverse impacts on migratory birds, thus reinforcing the importance of interpreting
the MBTA, as DOI had for decades, as applying to foreseeable incidental killing and
taking in appropriate circumstances.

**Defendants' Reversal in Response to Lobbying by the Oil and Gas Industry**

31.     In February 2017, shortly after President Trump took office, the Acting DOI Secretary suspended the Tompkins Opinion because it was "written in part to support regulations . . . that are currently under review by the new Administration." Letter from Acting Secretary to Acting Solicitor, *Temporary Suspension of Certain Solicitor M-Opinions Pending Review* (Feb. 6, 2017).

32.     In March 2017, President Trump issued an executive order, *Promoting Energy Independence and Economic Growth*, directing federal agencies to review their policies that purportedly impeded the development and use of oil and natural gas. Exec. Order 13783, § 2(a), 82 Fed. Reg. 16,093 (Mar. 28, 2017). In its report responding to the order, DOI identified reevaluating the MBTA's application to incidental killing and taking as one policy that would relieve regulatory burdens on the oil and gas industry. *See* Report of the Sec'y of the Interior, *Review of the Department of the Interior Actions that Potentially Burden Domestic Energy* 32-33 (Oct. 24, 2017).

33.     Representatives of the oil and gas industry lobbied DOI to issue a new directive that would eliminate any obligation to avoid killing migratory birds when engaging in various industrial activities. For example, on August 31, 2017, the Western Energy Alliance, a trade association that represents oil and natural gas companies, sent then-Secretary of the Interior Ryan Zinke a letter complaining that the "implementation and enforcement of incidental take of migratory birds . . . is inhibiting oil and natural gas development." The letter urged Secretary Zinke to

16

issue "guidance that [the] MBTA does *not* give FWS the authority to regulate incidental take for [sic] migratory birds." On November 3, 2017, the Director of Government Relations for the Independent Petroleum Association of America wrote to the Deputy Director of DOI's Office of External Affairs with the subject line "MBTA," asking "Any word on the solicitor's opinion yet?"

34.     Following such lobbying by representatives of the oil and gas industry, on December 22, 2017, the Solicitor's Office issued Opinion M-37050 – T*he Migratory Bird Treaty Act Does Not Prohibit Incidental Take* (Dec. 22, 2017) (Jorjani Opinion). The Jorjani Opinion reversed Defendants' longstanding interpretation of the MBTA, concluding that it does not apply to the incidental killing or taking of migratory birds. The Jorjani Opinion stated that the MBTA encompasses only "affirmative actions that have as their purpose the taking or killing of" birds. Under this new directive, only bird deaths that occurred in the course of hunting and poaching or similar activities, the precise purpose of which is the killing or taking of migratory birds, were covered. According to the Jorjani Opinion, an activity does not violate the MBTA, regardless of how many birds it foreseeably kills or its overall impact on migratory bird populations, so long as the activity is undertaken without an "affirmative" intention to kill or take birds. The Jorjani Opinion "permanently" withdrew and replaced the Tompkins Opinion.

35.     On December 22, 2017, the Principal Deputy Director of FWS told FWS personnel that "[t]oday, the Department of the Interior Solicitor's Office issued a binding opinion that will change the way [FWS] implements and enforces the

17

[MBTA]." Among other immediate actions to implement the Jorjani Opinion, FWS announced that it had suspended all investigations of incidental killing and would not undertake any new investigations or prosecutions.

36.     The Jorjani Opinion was severely criticized by high-ranking DOI and FWS officials from prior administrations of both parties. For example, in a January 2018 letter, seventeen high-ranking DOI and FWS officials from the Nixon, Ford, Carter, George H.W. Bush, Clinton, George W. Bush, and Obama Administrations "requested that [Secretary Zinke] suspend this ill-conceived opinion," which was "contrary to the long-standing interpretation by every administration (Republican and Democrat) since at least the 1970s." The officials explained that the Jorjani Opinion's "new, contrived legal standard . . .  creates a huge loophole in the MBTA" and "needlessly undermines . . .the effectiveness of the migratory bird treaties, and diminishes U.S. leadership" in migratory bird conservation. The officials also stressed that "[a]ll the past administrations for which we have worked have struck a balance and worked diligently and in good faith with industries that had significant impacts on birds . . . to reasonably address unintended take."

37.     Rather than withdraw or suspend the Jorjani Opinion, DOI and FWS took additional steps to implement it. In an April 2018 guidance memorandum, FWS instructed its staff that, as a result of the Jorjani Opinion, the agency "will ensure that [its actions] are not based on, nor imply authority, under the MBTA to regulate incidental take of migratory birds." Memorandum from Principal Deputy Dir., Fish & Wildlife Serv., to Serv. Directorate, *Guidance on the Recent M-Opinion*

*Affecting the Migratory Bird Treaty* Act (April 11, 2018) (FWS Guidance). As an example, FWS explained that, pursuant to the Jorjani Opinion, demolishing a structure with known nesting owls inside would no longer be considered an MBTA violation so long as the "purpose" of the action was to remove the structure, rather than kill the owls.

38.    FWS also announced that, as a result of the Jorjani Opinion, it would no longer consider promulgating regulations to create a permitting program for incidental take of migratory birds, as it had previously intended. *See* 83 Fed. Reg. 24,080 (May 24, 2018). FWS explained that such regulations would have "provided protection for entities that had taken efforts to reduce incidental take by [implementing] appropriate conservation measures to avoid or reduce avian mortality," but that "[d]ue to issuance of the [Jorjani Opinion], the actions [previously] contemplated" were "superseded, and we are no longer pursuing action on the [programmatic EIS]" the public was previously told would be prepared. *Id.*

39.    Companies responsible for migratory bird deaths responded to the Jorjani Opinion by eliminating or reducing their prior efforts to prevent or minimize avoidable bird deaths. For example, some companies failed to maintain birdproof netting that would otherwise prevent birds from drowning or being poisoned in oil waste pits. Documents obtained by Plaintiffs under the Freedom of Information Act demonstrated that, relying on the Jorjani Opinion and the FWS Guidance, Defendants stopped requiring companies to protect birds and informed companies

that they were under no obligation to take steps they had previously undertaken to avoid or minimize bird deaths.

40.     Although the Jorjani Opinion effectuated a dramatic shift in DOI's and FWS's longstanding policy and practice by eliminating any legal requirement for industry actors to minimize or mitigate their activities' foreseeable incidental impacts on migratory birds, including birds that are actively breeding and nesting, DOI and FWS did not conduct any NEPA review before issuing or implementing the Jorjani Opinion. NEPA requires federal agencies to take a "hard look" at environmental impacts before taking actions affecting the environment. *Constitution Pipeline Co., LLC v. N.Y. State Dep't of Envt'l Conservation*, 868 F.3d 87, 100 (2d Cir. 2017). In particular, NEPA requires preparation of an EIS for every "major [f]ederal action[] significantly affecting the environment." 42 U.S.C. § 4332(2)(C). An EIS must analyze the "environmental impact of the proposed action" and "any adverse environmental effects which cannot be avoided should the proposal be implemented." *Id*. § 4332(2)(C)(i), (ii).

### This Court Vacated the Jorjani Opinion as Contrary to the MBTA

41.     In May 2018, six of the Plaintiff conservation organizations here brought suit in this Court challenging the Jorjani Opinion. In September 2018, eight states filed a similar lawsuit. All of the Plaintiffs claimed that the opinion misconstrued the MBTA and should be set aside under the judicial review provisions of the Administrative Procedure Act. A number of the Plaintiffs further

claimed that the opinion and FWS Guidance had been unlawfully promulgated because DOI and FWS failed to comply with NEPA before adopting them.

42.    In July 2019, the Court consolidated the lawsuits and, in relevant part, denied Defendants' motions to dismiss on standing and other grounds. *NRDC v. U.S. Dep't of the Interior*, 397 F. Supp. 3d 430 (S.D.N.Y. 2019).

43.    On August 11, 2020, the Court granted summary judgment for all of the Plaintiffs on their claim that "DOI's interpretation of the MBTA" as set forth in the Jorjani Opinion "must be set aside as contrary to law under the [APA]." *NRDC*, 2020 U.S. Dist. LEXIS 143920, at *7. The Court held that the MBTA's unambiguous text "controls this case" because the statue's "clear language making it unlawful 'at any time, by any means or in any manner, to . . . kill . . . any migratory bird' protected by the conventions is in direct conflict with the Jorjani Opinion." *Id*. at *28. In addition, the Court ruled that the Jorjani Opinion's interpretation runs counter to the MBTA's purpose of protecting migratory bird populations. *Id*. at *26.

44.    The Court's comprehensive decision rejected the Jorjani Opinion's justifications for its narrow interpretation of the MBTA. For example, with regard to DOI's argument that "the constitutional avoidance canon supports its interpretation because otherwise 'kill' risks being unconstitutionally vague," the Court held that, "because the statute is unambiguous, using avoidance to create ambiguity or to distort the plain text is improper," and, in addition, the MBTA "is subject to regulatory exception, mitigating concerns about arbitrary enforcement." *NRDC*, 2020 U.S. Dist. LEXIS 143920, at *36-38.

45.     The Court held that vacatur—rather than remand alone, as DOI requested—was the proper remedy, because "[v]acating the Opinion simply undoes a recent departure from the agency's prior longstanding position and enforcement practice." *NRDC*, 2020 U.S. Dist. LEXIS 143920, at *46-47.

### Defendants' Proposed Regulation to Codify the Jorjani Opinion

46.     In February 2020—while the challenges to the Jorjani Opinion were pending in this Court—FWS published in the Federal Register a proposed regulation to codify the Jorjani Opinion's interpretation of the MBTA. 85 Fed. Reg. 5915 (Feb. 3, 2020). Stating that the "Office of the Solicitor performs the legal work for the Department of the Interior, including [FWS]," the agency set forth legal and policy justifications for its proposed rule that mirrored those in the Jorjani Opinion. *Id*. at 5916-23.

47.     At the same time, FWS informed the public that it intended to prepare an EIS that would "assess the impacts of codifying the Solicitor's Opinion, M-37050 and the effects on migratory bird populations of mortality resulting from incidental take." 85 Fed. Reg. 5913, 5914 (Feb. 3, 2020). FWS requested information on the "scope of the draft environmental review" that should be performed under NEPA. *Id*. at 5915.

48.     While FWS purported to solicit public comment for the purpose of engaging in an objective assessment of whether to issue a rule codifying the Jorjani Opinion, a January 30, 2020 press release issued by the agency belied any such objectivity. FWS's press release, in a "What They Are Saying" Addendum, set forth

statements supporting the proposed rule from representatives of the oil and gas industry, among others, who had been given preferential early notification of the proposed rule and an opportunity to comment on it publicly before it had been made available for general public comment.

49.     By letter dated February 4, 2020, David Klinger, who had worked in FWS's Office of Public Affairs from 1977-2012, requested "prompt clarification, public disavowal, and immediate withdrawal" of the press release, explaining that "[s]oliciting and promoting a series of apparently orchestrated and one-sided comments **prior to the opening of a formal public comment period**, and posting them online within the context of an official Department of the Interior agency news release, is a serious breach of communications ethics, contrary to a tradition of impartiality and adherence to procedure that has been scrupulously maintained by your agency's Office of Public Affairs for decades." (Emphasis in original). Similarly, a March 13, 2020 letter sent to the DOI Inspector General by ten retired DOI Public Affairs, External Affairs, and Communications Officers which "represent[ed] over 200 years of experience in Interior Department communications," explained that the January 30 press release was a "bizarre and unacceptable departure from the past practices of the Interior Department under both Republican and Democratic Administrations," and that "it is our understanding that professional staff within [FWS's] Division of Migratory Bird Management were urged, if not pressured, to assist in providing misleading information to the public or to otherwise violate their professional ethics."

50.     In their comments on the proposed regulation, Plaintiffs explained that the Jorjani Opinion's interpretation of the MBTA violates the statute's plain language and conservation purposes, and that none of FWS's proffered rationales for codifying the opinion justified eviscerating protections afforded to migratory birds under the agency's longstanding practice and policy. Plaintiffs provided examples—based on FWS's records obtained under FOIA—of how implementation of the Jorjani Opinion was harming migratory birds throughout the country, including by causing the abrupt termination of active investigations into bird deaths; the abandonment of measures designed to minimize and mitigate bird deaths; a cessation of reporting of bird kills by oil and gas companies, among others; and confusion among FWS enforcement agents and other officials as to how the MBTA should be applied under the new interpretation.

51.     Multiple federally recognized Native American Tribes objected to the proposal on the grounds that its adoption would violate Tribe-specific treaties dating back to the mid-1800s and that FWS would be violating the federal government's trust obligations towards the Tribes by proceeding with the proposal.

52.     Plaintiffs and many others urged FWS to abandon the proposed rule, withdraw the Jorjani Opinion, and resume its prior enforcement practices along with consideration of a comprehensive permitting system for incidental take. According to an assessment of the comments by contractors for FWS, over 99% of the public comments submitted to FWS opposed the proposed rule.

53.     Plaintiffs and other commenters advised FWS that, if the agency proceeded with its rulemaking, its NEPA analysis should evaluate how many birds had already been lost due to the Jorjani Opinion as well as the likely future impacts on bird populations, particularly imperiled and declining species. Plaintiffs explained that a "hard look" at impacts under NEPA should address which species have and will be affected; the industrial activities involved; and the specific minimization and mitigation measures previously followed that had been abandoned as a result of the Jorjani Opinion or would likely be abandoned in the future should the Opinion be codified. Plaintiffs' comments also explained that the Service was obligated by NEPA as well as the Endangered Species Act, 16 U.S.C. § 1536(a)(2), to analyze the effect of the opinion and proposed rule on species already listed as endangered or threatened as well as species not presently listed but that will be pushed closer to extinction because they lost MBTA protections.

**FWS's Draft Environmental Impact Statement**

54.     In May 2020, FWS issued a draft EIS (DEIS) for public comment. The DEIS stated that the "purpose and need" of the proposed action was to "provide legal certainty for the public regarding what actions are prohibited under the MBTA" and to "provide an official regulatory definition of the scope of the [MBTA] as it relates to incidental take of migratory birds." DEIS at 3. The "purpose and need" statement made no reference to the MBTA's statutory purpose of promoting migratory bird conservation. *Id*.

55.     To meet the narrowly defined "purpose and need," FWS "propose[d] a no action and two action alternatives to be analyzed in this draft EIS." DEIS at 4. "Under the No Action Alternative"—which, under NEPA regulations, is supposed to serve as the baseline for consideration of impacts associated with a proposed action—FWS "would continue to implement the MBTA consistent with the direction given in the [Jorjani Opinion], which defines the scope of the MBTA to exclude incidental take," notwithstanding the fact that the Jorjani Opinion's reversal of longstanding policy and practice was never subjected to any NEPA review.

56.     The DEIS considered only two "Action Alternatives" in any detail. Under one alternative, FWS would promulgate a regulation that would "be consistent with the [Jorjani Opinion's] conclusion that the MBTA's prohibitions . . . are limited to intentional actions directed at migratory birds, their nests, or their eggs." DEIS at 5. The DEIS stated that this was FWS's "preferred alternative because it complies with the Solicitor's legal analysis of the scope of the MBTA and reduces the regulatory burden on the public and the enforcement burden on [FWS's] law enforcement officers." *Id.* Under the other "Action Alternative," FWS "would promulgate a regulation to implement the MBTA as it applies to incidental take under the prior interpretation outlined in M-Opinion 37041 [the Tompkins Opinion]," *i.e.*, the agency would "revert" to its longstanding "view [of] the incidental take of migratory birds as a violation of the MBTA." *Id.* According to the DEIS, "[t]here would be no initial regulatory framework to authorize incidental take under this alternative." *Id.*

26

57. The DEIS stated that FWS "considered" two additional alternatives "but determined not to carry them forward for further analysis because they do not meet the purpose and need for the proposed action." DEIS at 5. Under one of those alternatives, FWS would withdraw the Jorjani Opinion and "subsequently establish[] a regulatory general-permit framework" for incidental take, which, *e.g.*, could "establish[] best practices as permit conditions to reduce or avoid . . . hazards" to migratory birds. *Id*. at 6. According to the DEIS, FWS "eliminated this alternative from further review at this time because developing a general-permit system would be a complex process" and "goes beyond the current purpose and need of simply providing regulatory certainty regarding [FWS's] interpretation of the MBTA as it relates to incidental take." *Id*.

58. Under the other alternative FWS eliminated from further review, the agency would withdraw the Jorjani Opinion and "develop an enforcement policy requiring gross negligence to establish a misdemeanor violation of the MBTA." DEIS at 6. FWS eliminated this alternative because it "would have established a minimum *mens rea* of gross negligence before the [agency] could enforce the statute's misdemeanor provision," but "[m]ost federal courts have concluded that this provision" should be "treated as a strict liability violation." *Id*. at 7.

59. As to the "no action" and two action alternatives that FWS stated would be "analyzed," the DEIS contained only a conclusory assessment of impacts. The DEIS acknowledged that the effect on migratory birds of both the "no action" alternative of maintaining the Jorjani Opinion and the alternative of formally

codifying the Opinion would be "[l]ikely negative" and result in "increased bird mortality" that "may be significant" as companies refrain from implementing "best practices" designed to avoid or minimize bird deaths. DEIS at 8, 46. For example, the DEIS conceded that "reduced incentives for netting oil pits . . . is likely to result in more birds dying in uncovered pits." *Id.* at 50. But FWS made no effort to analyze the magnitude of these adverse effects or the extent to which they would have population-level of species-level impacts on migratory birds.

60.     Plaintiffs and others—including former DOI and FWS officials and employees—submitted comments explaining that FWS's analysis of adverse impacts fell far short of NEPA's "hard look" requirements. They also pointed out other flaws and omissions in the DEIS, including: (1) the lack of consideration of impacts on Native American and other cultural interests; (2) the failure to consider adverse effects on U.S. treaty obligations to conserve migratory birds that cross international boundaries; (3) the inconsistency between FWS's reliance on industrial "best practices" as mitigation for the adverse effects of the proposed rule and FWS's simultaneous concession that the proposed rule will eliminate any incentive to implement such practices; (4) the impropriety of using, as a baseline "no action" alternative, a Solicitor's Opinion that had never gone through NEPA review and reversed decades of agency policy and practice; and (5) the failure to evaluate reasonable alternatives that would afford industry more regulatory certainty while also furthering bird conservation—such as a general permitting system.

61.     In comments on the DEIS as well as the proposed rule, the Government of Canada told FWS that the proposal to continue or codify the Jorjani Opinion "is inconsistent with previous understandings between . . . Canada and the [United States] and is inconsistent with the long-standing protections that have been afforded to non-targeted birds under the [Canada Convention]." Canada further stated that "removing the prohibition on any management of incidental take would cause significant ecological harm to migratory bird species" and "will substantially increase migratory bird mortality and threaten populations . . . in contravention of the Convention."

**FWS's Adoption of a Final Regulation Codifying the Jorjani Opinion Notwithstanding Its Vacatur by this Court**

62.     Following this Court's August 11, 2020 decision declaring the Jorjani Opinion unlawful and vacating it on that basis, the Plaintiff organizations in that litigation wrote to the FWS Director and DOI on September 3, 2020 requesting that FWS withdraw the proposal to codify the illegal opinion. Likewise, the Chairman of the Stillaguamish Tribe of Indians, by letter dated August 27, 2020, requested that DOI and FWS withdraw the proposal "in light of the recent federal court ruling" because "[g]iven that the proposed rule merely implements the Jorjani Opinion, which the federal court has vacated as unlawful, both logic and respect for the rule of law now dictate that you withdraw the proposed rule immediately."

63.     Instead, FWS issued a final EIS (FEIS) in November 2020 that largely mirrored the DEIS. In issuing the FEIS, FWS did not rectify any of the flaws or omissions identified by Plaintiffs and other commenters. To the contrary, FWS

compounded its errors by describing the "No Action Alternative"—i.e., the status quo that would be maintained in the absence of the proposed rule—as "[c]ontinuing to implement the MBTA *consistent with the interpretation established by [the Jorjani Opinion]*," notwithstanding the Court's Order vacating the Opinion. FEIS at 5 (emphasis added). The FEIS acknowledged that "a[f]ter issuance of the proposed rule and draft EIS, a federal district court vacated [the Jorjani Opinion]," *id*. at 13, but did not set forth a legal justification for continuing to implement a vacated agency decision document beyond asserting that "[w]e respectfully disagree with the district court's holding" and the "court's vacatur of the [Jorjani Opinion] does not directly affect our rulemaking process." *Id*.

64.     As with the DEIS, the FEIS conceded that continuing to implement the Jorjani Opinion—with or without codification in a rule—would "likely" have "negative" effects on migratory birds because there "would likely be a reduction in the number of best practices implemented." FEIS at 8. However, the FEIS did not take a hard look at the extent of those impacts or which species and populations of birds would be most affected and by what industrial activities. *Id*. The FEIS also conceded that continuing to implement the interpretation in the Jorjani Opinion would "likely" have "negative" effects on "biological resources" other than birds, on "ecosystem services" performed by birds, and on "cultural resources," but failed to set forth any meaningful analysis of the extent or nature of such adverse effects. *Id*. at 8-9. As with the DEIS, the FEIS defined the "purpose and need" for the action in a manner that excludes any concern for conservation of migratory birds or the

purpose of the statute. The FEIS again failed to analyze reasonable alternatives, including an incidental take permitting regime that would both further bird conservation and afford affected industries greater regulatory certainty.

65.     Following publication of the FEIS, the U.S. State Department received additional comments from the Government of Canada expressing concerns over FWS's plan to codify the Jorjani Opinion, including that Canada considers efforts to mitigate incidental take mortality to be at the "core" of the Convention between the countries; that removal of this protection would result in unmitigated risks to vulnerable bird populations in both countries; and that FWS should at least clearly identify the impacts of the proposed changes on migratory birds and how it will mitigate any expected negative impacts. FWS also received a peer-reviewed study— omitted from the FEIS—estimating that there was a decrease of 6 million birds in the U.S. between 2018 and 2019, i.e., during a time period the Jorjani Opinion was in effect.

66.     On December 31, 2020, FWS issued a Record of Decision that was the culmination of the agency's NEPA process and stated that FWS had decided to "promulgat[e] a regulation that defines the scope of the MBTA's prohibitions to include only actions directed at migratory birds" as provided in the Jorjani Opinion. FWS, *Record of Decision, Regulations Governing Take of Migratory Birds* (December 2020) (ROD), at 2. The ROD stated that, if FWS had decided to adopt the "No Action Alternative," the agency would have "*continue[d]* to implement the MBTA consistent with the direction in the [Jorjani Opinion]," notwithstanding the

Opinion's "vacatur by the District Court for the Southern District of New York." *Id.* at 4 (emphasis added). FWS did not explain the legal basis on which it could continue to implement an agency decision that had been vacated by this Court.

67.     On January 7, 2021, FWS published a final regulation in the Federal Register. 86 Fed. Reg. 1134 (Jan. 7, 2021). The regulation, which is set to take effect on February 8, 2021, codifies the vacated and unlawful Jorjani Opinion by providing that the MBTA's prohibitions "apply only to actions directed at migratory birds, their nests, or their eggs. Injury to or mortality of migratory birds that results from, but is not the purpose of, an action (*i.e.*, incidental taking or killing) is not prohibited by the [MBTA]." *Id.*

68.     The preamble to the final rule concedes that the rule is contrary to this Court's interpretation of the MBTA and the Court's vacatur of the Jorjani Opinion. 86 Fed. Reg. at 1145.

69.     The final rule preamble states that FWS is "aware of the recent science that demonstrates that North America has lost nearly 3 billion birds over the last 50 years" and "acknowledges that birds are currently in decline." 86 Fed. Reg. at 1147-48. The preamble also acknowledges that "incidental take of migratory birds has a negative impact on many migratory bird populations"; that this "rule will have some negative effects on populations of some species"; and that "this rule could potentially be a contributing factor in the future [Endangered Species Act] listing of a migratory bird species." *Id.* at 1149, 1158-59. The preamble asserts that these adverse impacts will be mitigated through "industry best practices" that are

"indispensable" to migratory bird conservation, *id*. at 1157, but at the same time concedes that "entities that currently employ mitigation measures to reduce or eliminate incidental migratory bird take" will in fact "reduce or curtail these activities" in response to continued implementation of the Jorjani Opinion. *Id*. at 1159. The preamble makes no effort to reconcile such inconsistencies.

70.     Along with the final rule, FWS issued a regulatory impact analysis conceding that the rule will confer "minimal" economic benefits on businesses "due to the fact that mitigation costs are small relative to the cost of projects." 86 Fed. Reg. at 1162. Nowhere in the rule or elsewhere has FWS endeavored to calculate the economic costs associated with inflicting negative effects on migratory bird populations.

## CLAIMS

### Count One

### The Rule Violates the MBTA and is Arbitrary and Capricious

71.     The Jorjani Opinion contravenes the plain language and conservation purpose of the MBTA, including for the same reasons as those enumerated by this Court in its decision finding the Jorjani Opinion unlawful.

72.     In adopting the final rule, FWS failed adequately to respond to public comments, including comments urging FWS to consider an incidental take permitting program as a reasonable alternative that would both promote bird conservation and also afford industry the increased regulatory certainty that FWS has proffered as a central rationale for the rule. The explanation for the rule is also

internally inconsistent in key respects, including by claiming that adverse effects of the rule will be mitigated by "voluntary" measures while conceding that the rule eliminates (and is designed to eliminate) the legal incentive for companies to adopt and implement such measures.

73.     For these reasons, the rule is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" and must be set aside under the Administrative Procedure Act. 5 U.S.C. § 706(2)(A).

**Count Two**

**Defendants Violated NEPA**

74.     Defendants violated NEPA by using an invalid baseline for its environmental analysis when it characterized its continued implementation of the unlawful Jorjani Opinion as the "no action" alternative in its FEIS. That baseline was invalid both because the Jorjani Opinion had already been vacated by this Court and because Defendants never conducted any NEPA review before issuing and implementing the Jorjani Opinion's dramatic reversal of longstanding policy and practice under the MBTA.

75.     Defendants also violated NEPA by adopting an FEIS that failed to take the requisite hard look at the environmental impacts of the rule and did not evaluate all "reasonable alternatives," such as adopting an incidental take permitting program. 50 C.F.R. § 1502.14(a). The FEIS's statement of "purpose and need" is also arbitrarily narrow because it entirely excludes any concern for

promoting the conservation of migratory birds or limiting the killing and injuring of birds.

76.    Consequently, by violating NEPA, FWS acted "without observance of procedure required by law." 5 U.S.C. § 706(2)(D).

## REQUEST FOR RELIEF

WHEREFORE, Plaintiffs respectfully that request this Court:

A.    Declare that the rule, FEIS, and ROD violate the MBTA, NEPA, and Administrative Procedure Act;

B.    Vacate the rule, FEIS, and ROD;

C.    Reinstate Defendants' interpretation and policy regarding MBTA coverage in existence before the Jorjani Opinion;

D.    Award Plaintiffs their costs of litigation; and

E.    Grant Plaintiffs such other relief as the Court deems just and proper.

Respectfully submitted,

/s/ *Ethan I. Strell*
Ethan I. Strell
Lorraine Sciarra
National Audubon Society
225 Varick St.
New York, NY  10014
(212) 979-3000
estrell@audubon.org
lsciarra@audubon.org

*Counsel for National Audubon Society*

/s/ *Ian Fein*
Ian Fein (*pro hac vice* applicant)
Mary Katherine Umekubo
Gonzalo E. Rodriguez
Natural Resources Defense Council
111 Sutter Street, 21st Floor
San Francisco, CA  94104
(415) 875-6100
ifein@nrdc.org
kumekubo@nrdc.org
grodriquez@nrdc.org

*Counsel for NRDC and NWF*

/s/ *William F. Sheehan*
William F. Sheehan (*pro hac vice* applicant)
American Bird Conservancy
4301 Connecticut Ave., N.W.
Washington, D.C.  20008
(202) 234-7181
Wsheehan123@gmail.com

*Counsel for American Bird Conservancy*

/s/ *Eric R. Glitzenstein*
Eric R. Glitzenstein (*pro hac vice* applicant)
Center for Biological Diversity
1411 K Street, N.W., Suite 1300
(202) 849-8401
eglitzenstein@biologicaldiversity.org

/s/ *Ryan Shannon*
Ryan Shannon (*pro hac vice* applicant)
Center for Biological Diversity
P.O. Box 11374
Portland, OR  97211
(971) 717-6407
rshannon@biologicaldiversity.org

*Counsel for Center for Biological Diversity*

/s/ *Jason C. Rylander*
Jason C. Rylander (*pro hac vice* applicant)
Defenders of Wildlife
1130 17th Street, N.W.
Washington, D.C.  20036
(202) 772-3245
jrylander@defenders.org

*Counsel for Defenders of Wildlife*

/s/ *Bridget Lee*
Bridget Lee
Sierra Club
9 Pine Street, Suite D
New York, NY 10005
(845) 323-5493
bridget.lee@sierraclub.org

*Counsel for Sierra Club*